**In re GRAND EAGLE COMPANIES, INC., Debtor.**

**Official Committee of Unsecured Creditors of Grand Eagle Companies, Inc., Plaintiff,**

v.

**Asea Brown Boveri, Inc., et al., Defendants.**

**Bankruptcy No. 01–54821.**
**Adversary No. 02–5090.**
Civ. Nos. 5:03–CV–00551, 5:03–CV–00552.

United States Bankruptcy Court, N.D. Ohio, Eastern Division.

Feb. 6, 2004.

---

Joseph Hutchinson, Marc Merklin, Brouse McDowell, Cleveland, OH, for Plaintiff.

Jeffrey Levinson, Margulies & Levinson LLP, Cleveland, OH, Christopher Meyer, Patrick Brooks, Squire, Sanders & Dempsey, Cleveland, OH, Colette Gibbons, Schottenstein, Zox & Dunn, Cleveland, OH, for Defendants.

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: MOTION TO APPROVE STIPULATED AGREED ORDER AUTHORIZING THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO INVESTIGATE AND PROSECUTE CLAIMS AND CAUSES OF ACTION ON BEHALF OF THE BANKRUPTCY ESTATE, AS AMENDED, AND OBJECTIONS THERETO

MARILYN SHEA–STONUM, Bankruptcy Judge.

This matter is before the Court pursuant to the Remand Decision[1], requiring

---

1. Capitalized terms not otherwise defined in the text of these Proposed Findings of Fact and Conclusions of Law shall have the same meaning ascribed to them in the attached Appendix A.

the Court to determine (1) whether the Committee has standing to pursue avoidance claims against the Pre–Petition Lenders based on the criteria set forth in *Canadian Forest Products Limited v. J.D. Irving, Limited (In re the Gibson Group, Inc.)*, 66 F.3d 1436 (6th Cir.1995); (2) because a proposed settlement was reached between the Committee and those lenders prior to the Remand Decision, whether the Committee has standing to conclude that settlement that has been the subject of a motion pursuant to Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 9019, and (3) whether the failure of the Committee to obtain a hearing from this Court and an order granting it standing prior to its commencement of the avoidance litigation filed on the February 28, 2002 deadline in the Cash Collateral Order was fatal to its ability to pursue those claims against the Pre–Petition Lenders. Although prior to the Remand Decision this Court had recommended the approval of the settlement between the Committee and the Pre–Petition Lenders by Judge Gwin in the withdrawn Adversary Proceeding, and while those lenders are still prepared to settle, they will do so only after this Court addresses the third issue identified above. Because the Chapter 11 Trustee has now commenced actions against the other defendants in the above-captioned adversary proceeding, pursuant to the stipulation of those defendants, the Committee and the Trustee, I am not further determining the Committee's standing to pursue avoidance claims against those entities at this time, but reserve the right to incorporate any or all of this work product should I be called upon to do so.

## A. OVERVIEW

Initially, I note that this case has become procedurally complex, having spawned two consolidated appeals to the United States District Court for the Northern District of Ohio, a withdrawal of the reference of the Adversary Proceeding after I ruled on a motion to dismiss, and a proposed settlement between the Committee and the Pre–Petition Lenders in the removed adversary proceeding which requires bankruptcy court approval. This procedural maze is no match, however, for the maze that had to be navigated by all parties in interest, including the Debtors who were briefly in possession, the trustee, the creditors' committee, the secured creditors and other parties who have been active during the initial phase of these chapter 11 cases.

Three days after the filing of the Chapter 11 cases, the Court granted the motion of the Debtors' management for the appointment of a chapter 11 trustee. Glenn Pollack, a newcomer to the Debtors' businesses, was appointed as chapter 11 trustee. He immediately set out to maximize the value of the Debtors' estates through the sale of the three lines of the Debtors' business as going concerns; the Debtors' service businesses operated out of three dozen different locations. To do so the Trustee sought authority to use cash collateral of the Pre–Petition Lenders. Since the Pre–Petition Lenders claimed a blanket lien on all of the Debtors' assets, the Pre–Petition Lenders were likely to be the principal beneficiaries of the use of their cash collateral, the terms of which were negotiated with the Trustee, to maintain the businesses as going concerns until quick sales could be orchestrated.

At the end of January, 2002 the Trustee, with the support of the Pre–Petition Lenders, filed motions seeking authority to sell the Debtors' businesses. The Trustee's sales of the various aspects of the busi-

nesses were approved by the Court on February 26, 2002. Thereafter, the Trustee continued to market the balance of the assets, to liquidate accounts receivable and to address a myriad of contract and other case administration matters. Only 82 days after the Chapter 11 cases were filed and approximately 55 days after the Committee retained counsel, the Committee filed its Complaint (defined below) on February 28, 2002, that is, the deadline by which any such litigation against the Pre–Petition Lenders had to be filed under the terms of the order authorizing the Debtors to use the Pre–Petition Lenders' cash collateral.[2]

I could continue at great length about the fast pace of the first few months of this or any other chapter 11 case. Appendix A to this opinion does catalog the activity in this case through February 28, 2002 and beyond. The reason for highlighting the pace is to underscore the demands placed on all estate professionals in the initial phase of a chapter 11 case (and upon the bankruptcy judge). This pressure often results in a division of labor among the estate professionals, particularly those whose interests and duties are aligned, as are the interests of the Trustee and the Committee with respect to realizing the rights of creditors of the estate and translating those rights into value to be distributed to creditors.

Before addressing the specific findings of fact and conclusions of law on the standing issue on remand, it is necessary to define the task with specificity and precision. Both of the district judges who have addressed this matter and I are trying diligently to apply *Gibson* in which the Sixth Circuit enunciated the need for

---

2. Bankruptcy courts recognize that these types of deadlines are not uncommon. In *Official Comm. of Unsecured Creditors of America's Hobby Center, Inc. v. Hudson United Bank (In re America's Hobby Center, Inc.)*, 223 B.R. 275 (Bankr.S.D.N.Y.1998), the bankruptcy court explained,

> Having little leverage and a pressing need for cash with which to operate, chapter 11 debtors not fortunate or well-heeled enough to have acquired postpetition financing typically ratify their prepetition lending agreements and waive the right to challenge the lender's security interest in return for the lender's agreement to the debtor's use of the lender's cash collateral. Through this vehicle, those debtors obviate expensive and potentially unsuccessful court battles for authority to use their own cash. Almost always, these cash collateral stipulations (albeit sometimes only through the intercession of the judge) reserve to the creditors' committee, acting on behalf of the estate, the ability to challenge the perfection, enforceability, or priority of the liens. And frequently, if the creditors' committee wishes for its counsel to be paid for its efforts out of the lender's collateral, that right to sue is circumscribed by an outside date.

*Id.* at 278.

> While the parties in interest have drafted the order, it is the order of that judge whose interpretation of the order deserves substantial deference. *See infra* p. 97. As I have previously noted, I read the cash collateral order in this case to require simply the commencement of litigation by the deadline.

Any issues of standing would be addressed and in fact were addressed, as standing issues generally are and as they were in *Gibson,* by separate motion. In *Gibson,* a creditor filed a motion for authority to prosecute, on behalf of the debtor's estate, an adversary proceeding to avoid and recover preferential transfers. 66 F.3d at 1439. The bankruptcy court in *Gibson* granted the motion but reserved for later decision the issue of the creditor's standing. *Id.* The creditor filed its complaint. *Id.* Then, the named defendants filed a motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure as adopted by Bankruptcy Rule 7012. *Id.* The bankruptcy court's ruling on the defendants' motion to dismiss is the subject of the appeal heard by the Sixth Circuit in *In re Gibson Group, Inc.,* 66 F.3d 1436, 1439–40, 1446.

bankruptcy courts to consider the standing of plaintiffs other than the debtor in possession or trustee pursuing certain avoidance actions in the context of bankruptcy cases.[3]

It has been recognized by all who have dealt with the Committee's standing in this case that the controlling law in the Sixth Circuit is *Gibson*, although Judge Polster did find guidance in *In re Colfor, Inc.*, 1998 WL 70718, *2 (Bankr.N.D.Ohio 1998) and looked to the Third Circuit's consideration of derivative standing in *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir.2003) cert. denied —— U.S. ——, 124 S.Ct. 530, 157 L.Ed.2d 407 (2003)(NO. 03–330). When I first dealt with the standing issue in the spring of 2002, I did not parse the extent to which *Gibson* applied to the Adversary Proceeding. To complete my task on remand properly, I believe it is useful to look closely at these cases because the facts of each is instructive.

In *Gibson* an individual creditor was intent on pursuing §§ 547 and 548 avoidance actions, that is, actions that by definition do not exist until the filing of a bankruptcy and that are intended to promote equality of distribution among creditors of like priority within the bankruptcy priorities. Such actions are rarely the province of an individual creditor. In *Gibson* both the debtor in possession and the official creditors' committee did not respond to the demand of the plaintiff creditor that a particular avoidance action be initiated although there were serious allegations of prepetition transactions that may have favored one particular creditor by the material sum of approximately $3 million.

The Sixth Circuit reversed the bankruptcy and district court's determination that the individual creditor should be automatically denied standing to pursue those avoidance actions because it did not match the statutorily designated plaintiff, "the trustee." The Sixth Circuit recognized the legitimacy of derivative standing of a single creditor seeking to recover for the benefit of the bankruptcy estate, building into its decision the protection against maverick individual creditor actions. Specifically, the Sixth Circuit would only recognize an individual creditor's derivative standing upon a showing that the debtor in possession *and the creditors' committee* had failed to act on the plaintiff creditor's demand to bring the claims and that there was a colorable claim as to which the likely

---

**3.** Generally, standing determinations require a two-tiered analysis. *In re America's Hobby*, 223 B.R. 275, 279. "The court must first determine whether the plaintiff has standing under the Constitution and then under certain judicially-engrafted prudential principles, including whether the plaintiff's claims fall within the zone of interests to be protected or regulated by the statute in question." *Id.* In this case, none of the parties have challenged the Committee's standing under the Constitution. The challenge to the Committee's standing, instead, has only been to statutory standing.

The problem arises because of the use of the phrase "the trustee" in the Bankruptcy Code.

Whereas a trustee (or, where a debtor is in possession, the debtor in possession) has explicit statutory authority to institute suit on behalf of the estate with which he or she is entrusted, *see* 11 U.S.C. §§ 323, 704, 1106 and 1107, there is no such explicit authority for creditors' committees to initiate adversary proceedings. *See STN Enterprises*, 779 F.2d at 904. Pointing to sections 1103(c) and 1109(b) of the Bankruptcy Code, the Second Circuit in *STN Enterprises* held that there is an implied but qualified right for creditors' committees to bring actions on behalf of the estate with the approval of the bankruptcy court if the debtor in possession "unjustifiably fail[s] to bring suit." *Id. See Chemical Bank v. Pilevsky*, 1994 WL 714287 at *2 (S.D.N.Y.1994). *In re America's Hobby Center*, 223 B.R. at 279

benefit to the estate would be greater than the costs incurred in pursuing the claim. These criteria draw upon the touchstone for assessing the activity of both trustees and official creditors' committee, the business judgment rule. Where the estate's representatives, including the creditors' committee, fail to pursue claims that have a likelihood of increasing the dividend to be distributed to creditors, the Sixth Circuit rightly recognized the need for the remedial possibility of an individual creditor's derivative standing.

■■■ Because *Gibson* was an appeal by the would-be plaintiff, the question of who has standing to object to derivative standing being granted to other than "the trustee" is obscured. In *Gibson* the standing of the plaintiff was raised on a Rule 12(b)(6) motion in the adversary proceeding which remained on the bankruptcy court's docket. The defendant in that action was the recipient of alleged preferences and fraudulent conveyances. A close reading of *Gibson* discloses that criteria for addressing the issue of the plaintiff's derivative standing are external to the adversary proceeding and more properly addressed in the main case. That is, determining whether derivative standing should be conferred on an individual creditor or on the Official Committee of Unsecured Creditors is not the basis for the defendants in the (potential) litigation to get a first bite at the apple. The question to be answered in a so-called *Gibson* hearing is whether it is in the best interests of the bankruptcy estate for litigation that the trustee might pursue, but is unable or unwilling to do so, to go forward with a derivative plaintiff. Unless the (potential) defendant is a party in interest in the main case, that party should not be permitted to participate in the main case. *See* 11 U.S.C. § 1109(b). If the (potential) defendant happens to have standing, that par-

ty's participation must be relevant to addressing the best interests of the estate. I lost sight of these important limiters when I permitted the Former Shareholders to participate in the May 2002 standing hearing. Had I focused on the lack of standing of the former shareholders on this issue, Judge Polster would have been spared one of the two appeals.

While the Grand Eagle Creditors' Committee has included § 547 claims in its complaint, the fraudulent conveyance claim is a creditor's remedy grounded in state law that § 544 also permits the trustee to pursue once the bankruptcy is filed. The trustee derives his standing from prepetition creditors on § 544 claims. Thus, the recognition within the bankruptcy case of the derivative standing of a Creditors' Committee to pursue state law creditors' remedies that are alleged to have preexisted the filing of the bankruptcy case is simply less problematic than Committee or individual pursuit of §§ 547 and 548 avoidance claims.

Similarly, the Committee has included a prayer for subordination of the Pre–Petition Lenders' claims to the claims of general unsecured creditors pursuant to § 510(c) of the Code, a section that makes no particular reference to the trustee and as to which there thus appears to be no derivative standing issue. Again when the Creditors' Committee in this case brought its motion to be granted derivative standing, I did not then distinguish between claims that the Committee could bring directly and claims as to which the derivative standing was an issue. Had I done so in the first instance, Judge Polster would have been presented with more clearly defined issues.

■■■ Recognizing the direct standing of the Committee with respect to the § 510 claim provides one clear answer to the question of whether there was a claim

brought against the Prepetition Lenders as of the February 28 deadline that is not clouded by the derivative standing issue. To the extent that the bankruptcy judge in *Colfor* suggests otherwise, an examination of the authorities cited in that case demonstrate a misreading of those authorities. *Colfor* cites *Midlantic Nat'l Bank N., N.A. v. Borg–Warner Acceptance Corp. (In re Mayo)*, 112 B.R. 607, 651 (Bankr.D.Vt. 1990) for the proposition that "normally only the trustee or debtor-in-possession has standing to pursue such matters." In *Mayo*, the court held that an individual secured creditor had standing to pursue a Bankruptcy Code section 510(c) action for equitable subordination against another secured creditor because the chapter 7 trustee had not brought such a suit and the only relief being sought was the subordination of one secured creditor's claim to the claim of another secured creditor. *Id.* The *Mayo* court makes its blanket statement regarding standing in reliance on *MH Gordon & Son, Inc. v. Debtor and Committee of Unsecured Creditors*, 62 B.R. 552, 554 (D.Mass.1986).

In *MH Gordon*, the bankruptcy court, *sua sponte*, raised the issue of equitable subordination of one creditor's claim to the claims of the other unsecured creditors pursuant to Bankruptcy Code section 510(c). On appeal, the district court wrote,

> The bankruptcy court has long been known as a court of equity which exercises its equitable powers to ensure that substance does not give way to form and technical considerations do not prevent substantial justice from being done. *Pepper v. Litton*, 308 U.S. 295, 304–05, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939). Indeed, a bankruptcy court has the duty, as well as the power, to examine the circumstances surrounding a claim to see that injustice and unfairness are not done when allowance of the claim will

accrue to the benefit of a controlling stockholder with fiduciary obligations to a corporation. *Id.* at 307–08, 60 S.Ct. [at] 246. To fulfill this mandate, a bankruptcy court itself may have to raise the issue of equitable subordination if a party in interest has failed to do so. The language of section 510(c) supports this proposition. The statute provides that "... the *court* may ..." equitably subordinate a claim. It does not limit the court's ability to exercise its equitable powers to situations where a party has raised the issue.

*M.H. Gordon*, 62 B.R. at 554.

The district court also noted that the issue of equitable subordination had been appropriately raised by a *party* during a bankruptcy court hearing.

> Furthermore, although the issue of equitable subordination was not raised as an affirmative defense in the pleadings, it was raised by a party during the hearing on M.H. Gordon's claim before the Bankruptcy Court. The hearing was conducted during three days in 1985: February 25, April 3, and April 15. At the outset of the first hearing on February 25, Judge Lavien questioned counsel as to what issues were being litigated. Counsel representing the creditors' committee and the debtor, while enumerating the issues in the case, stated without objection that an important question was whether M.H. Gordon was an insider whose claim would then be subordinated under the approved plan "without even reaching a *question of equitable subordination of which we also believe would be appropriate in this case.*" (Emphasis added). The propriety of applying equitable subordination to M.H. Gordon's claim was thereby raised by a party to the matter.

*MH Gordon,* 62 B.R. at 554–55. The *MH Gordon* court does not hold or even suggest that standing is limited to the trustee and debtor-in-possession on equitable subordination issues. Rather, the court only noted that the appellants argued, unsuccessfully, that standing is limited. *Id.* at 554. The *MH Gordon* court disagreed and dismissed the appeal. *Id.* at 555.

Thus, in both *Colfor* and *Mayo,* the courts' holdings are based on an incorrect reading of the case authority cited for those holdings and find no support in the language of § 510(c). In contrast to the *Colfor* and *Mayo* decisions, and in keeping with the true holding of the court in *MH Gordon,* the Seventh Circuit Court of Appeals makes the distinction between an individual creditor's standing to pursue bankruptcy avoidance claims and to pursue equitable subordination. *In re Vitreous Steel Products Co.,* 911 F.2d 1223, 1230–31 (7th Cir.1990). The Seventh Circuit wrote:

> However, NIPSCO [an individual creditor] does have standing to seek equitable subordination of the Bank's claim in bankruptcy under § 510(c). Equitable subordination is not a benefit to all unsecured creditors equally, at least where the creditor whose claim is objected to is at least partially unsecured; it is a detriment to the creditor whose debt is subordinated. Thus, when a party seeks equitable subordination, it is not acting in the interests of all the unsecured creditors. While the Trustee may find that it is in the best interests of the estate to seek equitable subordination, individual creditors have an interest in subordination separate and apart from the interests of the estate as a whole. The individual creditor should have an opportunity to pursue its separate interest. We reverse the dismissal of NIPSCO as plaintiff in its claim for subordination of the Bank's debt.

*In re Vitreous Steel Products Co.,* 911 F.2d at 1231; *see also Variable-Parameter Fixture Development v. Comerica Bank–California (In re Morpheus Lights, Inc.),* 228 B.R. 449, 453 (Bankr.N.D.Cal.1998) (noting that the standing of an individual creditor to pursue actions is different from the standing of a creditors' committee and writing that "for purposes of deciding the standing issue, an unsecured creditors' committee asserting claims on behalf of chapter 11 debtor also stands in a position analogous to that of a trustee and thus, could be treated as though it were a trustee").

Based on the discussion above and on the specific language in Bankruptcy Code section 510(c), a *party* has standing to raise equitable subordination. The Committee is such a party. The *Colfor* court incorrectly presumed the applicability of *Gibson* to the issue of standing to raise equitable subordination pursuant to Bankruptcy Code section 510(c). For all of the reasons above, this is clearly not the case. While this arguably provides a complete answer to the question that the Prepetition Lenders have required an answer prior to giving unqualified reaffirmation of their desire to settle, I am addressing this matter on remand from two district judges and will proceed to answer all questions implicated in the Remand Decision as that decision pertains to the Prepetition Lenders.

█ With respect to bankruptcy avoidance actions, such as preference actions brought pursuant to Bankruptcy Code section 547, and, for the reasons stated above, to a lesser extent with respect to § 544 claims, derivative standing is at issue. It is in the public interest that parties who do not have standing not be allowed to call upon finite judicial resources to pursue rights that are not theirs in the first instance. That said, it is worth

noting the judicial resources that have already been expended in this case over the last 23 months on the *preliminary* issue of standing and matters closely related to that issue. The following is a catalog of those court work products:

**U.S. Bankruptcy Court, N.D. Ohio**

**Adv. Pro. No. 02–5090**

Memorandum Opinion RE: Motion to Dismiss Adversary Proceeding Filed by Asea Brown Boveri Inc and Motion to Dismiss Adversary Proceeding Pursuant to F.R.C.P. 12(b)(6) and 9(b) Filed by The Prudential Ins Co of America.(Entered: 01/15/2003) (27 page document)

**Main Case No. 01–54821**

Entry of Judgment, Pursuant to the Court's oral decision, granting Motion and Amended Motion for entry of order authorizing the Official Committee of Unsecured Creditors to investigate and prosecute certain claims and causes of action on behalf of the bankruptcy estate Filed by Unsecured Creditors' Committee (Pleading Nos. 183 and 230) and overruling the Objection of Credit Agricole Indosuez as pre-petition agent for itself and other lenders (collectively, the Pre–Petition Lenders) (Pleading No. 187) and Memorandum of former Grand Eagle Shareholders, including Jerry Oliver William, (collectively, the "Former Shareholders" in opposition (Entered: 06/27/2002)) (the oral decision when transcribed was a 30 page document) Proposed Findings of Fact and Conclusions of Law RE: Motion to Approve Compromise and Settlement and Objections thereto filed by the Court. 783, 794, 802, 808, 810, 811, 812, 817 (Entered: 10/28/2003) (25 page document) Supplement to "Proposed Findings of Fact and Conclusions of Law Re: Motion to Approve Compromise and Settlement and Objections thereto" (Entered: 12/16/2003) (7 page document)

**U.S. District Court, N.D. Ohio**

**Case No. 5:02cv01668**

Memorandum of Opinion and Order granting shareholders' appeal and reversing decision authorizing the adversary proceeding. Bankruptcy Court to conduct a further hearing on this matter and issue a report and recommendation to Judge Gwin by 1/30/04. Signed by Judge Dan Aaron Polster on 11/20/03. (P, R) (Entered: 11/20/2003) (12 page document)

**Case No. 5:03cv00551**

Opinion and Order signed by Judge James S. Gwin on 11/24/03.(Entered: 11/24/2003) (9 page document)

Order signed by Judge James S. Gwin on 1/9/04. (Entered: 1/9/2004) (2 page document)

In addition, Judge Polster's scheduling orders with respect to the appeals on his docket reference the Third Circuit's consideration of the standing of creditors' committees in *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir.2003) cert. denied —— U.S. ——, 124 S.Ct. 530, 157 L.Ed.2d 407 (2003)(NO. 03–330), a case that attracted significant attention prior to its *en banc* reversal. All of this effort with respect to the *preliminary* issue of standing suggests a need to analyze thoroughly the application of *Gibson* to cases in which the official committee of unsecured creditors, and not an individual creditor, seeks recovery for the estate. Clearly, a creditors' committee "does not have unfettered discretion to sue simply on its own say-so." *In re America's Hobby Center, Inc.*, 223 B.R. at 280.

The questions that remain open are (1) whether the potential defendants can dictate the date by which a bankruptcy court must both hear and decide the derivative standing issue, (2) the nature of the hear-

ing that the bankruptcy court must hold, and (3) who has standing at such a hearing. These open questions should be answered by close focus on due process, the procedural context and for whose benefit such hearing is to be held. At a *Gibson* hearing, the bankruptcy court is to consider whether the debtor's estate is likely to benefit from allowing the creditors' committee to pursue avoidance claims in the debtor's stead.[4]

## B. BACKGROUND

### The Remand Hearing

Pursuant to the Remand Decision, this Court commenced the Remand Hearing on December 1, 2003 to determine (1) whether the Committee could meet the standing requirements set forth by the Sixth Circuit Court of Appeals in *In re the Gibson Group, Inc.* and (2) whether the February 28, 2002 *filing* deadline agreed to by the Chapter 11 Trustee and the Pre-petition Lenders and set forth in a December 20, 2001 Cash Collateral Order required this Court to make a determination regarding any derivative standing in this case prior to February 28, 2002. That hearing time had originally been set aside to address the confirmation of a chapter 11 plan in this case. That hearing has been indefi-

nitely postponed pending resolution of matters identified in the Remand Decision and Judge Gwin's November 24, 2003 Order.

The Court commenced the Remand Hearing on December 1, 2003.[5] At the Remand Hearing on December 1, 2003 the Court heard opening statements from counsel for the Committee, Asea Brown, the Former Shareholders, the Pre-Petition Lenders and Prudential and a brief report from the Chapter 11 Trustee regarding his negotiations with the parties. Thereafter, the Committee called and began direct examination of its first witness, Scott King. Upon the Committee's Motion, this Court qualified Mr. King in the Remand Hearing as a business valuation expert.[6]

After Mr. King's direct testimony and upon a request of all counsel, the Court recessed the Remand Hearing to permit a discussion as to a potential resolution of certain matters. When this Court resumed the Remand Hearing, counsel reported that they had prepared a pleading captioned "Stipulation of the Parties Resolving Issues Related to the Prosecution of Certain Claims and Causes of Action on Behalf of the Bankruptcy Estate" (the "Stipulation"). Pursuant to the Stipula-

---

4. With this focus, it is clear that the only parties who are entitled to contest the standing of the creditors' committee are those parties who have an interest in the debtors' estate. In short, at a *Gibson* hearing, potential defendants have standing only if they happen to be interested parties in the Chapter 11 case and only on the issue of benefit to the estate. In this instance, it is clear that the former shareholders do not have an interest in the Debtors' estate and thus should not have been heard with respect to the Standing Motion.

5. Appearing at the Remand Hearing on December 1, 2003 were Michael Zaverton, as counsel for the Chapter 11 Trustee; Marc Merklin and Joseph Hutchinson, as counsel for the Committee; Robin Weaver and Pat-

rick Brooks, as counsel for Asea Brown Boveri, Inc.; Collette Gibbons and Mark Lichtenstein, as counsel for the Former Shareholders; Jeff Levinsion, Benjamin Hoch and Richard Reinthaler, as counsel for the Pre-Petition Lenders; and Jeff Levinson, as counsel for The Prudential Insurance Company of America ("Prudential"), one of the Pre-Petition Lenders. Also present at the Remand Hearing on December 1, 2003 was Glenn Pollack, Chapter 11 Trustee in this case.

6. Rulings such as this one presumably are only effective for the purposes of the Remand Hearing and do not operate even as law of the case in the withdrawn Adversary Proceeding.

tion, the parties agreed to, among other things, the following:

&ast; &ast; &ast; &ast; &ast; &ast;

10. The [Remand Hearing] is adjourned to an indefinite date, pending a final order on approval of the Settlement Agreement.

Based upon the terms of the Stipulation and in order to conserve judicial resources, the Court consented to entry of the Stipulation [main case docket # 889]. Given entry of the Stipulation, this Court indefinitely adjourned the Remand Hearing.

On January 9, 2004, apparently in response to a motion of the Committee to approve the settlement (and opposition thereto) filed with the District Court on December 15, 2003, Judge Gwin directed that this Court complete the Remand Hearing that was adjourned on December 1, 2003 and submit proposed findings and conclusions to the District Court in accordance with the Remand Decision. On January 12, 2004,[7] the Court reconvened the Remand Hearing.[8] At the continued Remand Hearing, the parties agreed that because the Trustee had now commenced an adversary proceeding against Asea Brown Boveri, Inc. and the Former Shareholders, the only remaining matter before the Court was the standing of the Committee to pursue the Adversary Proceeding against and the settlement thereof with the Pre–Petition Lenders. *See* Stipulation of Parties Regarding Continued Standing Hearing Held on January 12, 2004, ¶ 4 [filed in U.S. D.Ct. Case No. 5:03–CV–00551/5:03–CV–00552 on January 21, 2004].

At the continued hearing, the Committee called and concluded its direct examination of Michael Fixler and Sherrill Steven Speers. Exhibits 1 through 9 were admitted into evidence. The Pre–Petition Lenders, although provided the opportunity, did not cross examine any of the witnesses, nor did any other interested party.

## C. JURISDICTION

The Standing Motion was properly filed in the Debtors' main chapter 11 case. Although the resolution of the Standing Motion would generally be a core matter,[9] in light of the Remand Order, Judge Gwin's January 9 Order and given the intervening of the partial settlement of the withdrawn Adversary Proceeding, the Court's decision on the matter is not being filed as a final order. Instead, this decision will constitute findings of fact and conclusions of law that will be submitted to Judge Gwin for review.[10]

---

7. Given the January 30, 2004 deadline imposed by Judge Polster, this Court had no choice but to immediately recommence the Remand Hearing because it was the only day on which hearings were not already scheduled on the Court's calendar through the end of January.

8. Appearing at the continued Remand Hearing were Michael Zaverton, as counsel for the Trustee; Collette Gibbons and Thomas Schell (telephonically), as counsel for the Former Shareholders; Jeffrey Levinson, as counsel for the Pre–Petition Lenders; Mark Merklin and Joe Hutchinson, as counsel for the Committee.

9. Pursuant to 28 U.S.C. § 157(b)(3), "[t]he bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11." In comparison, the Court found that its decision on the Motion to Compromise pursuant to Bankruptcy Rule 9019 was not a final one because the settlement terms required the dismissal of the Pre–Petition Lenders from the Adversary Proceeding and the District Court had already withdrawn the reference with respect to the Adversary Proceeding.

10. A bankruptcy court has jurisdiction to render final orders and judgments in "core" proceedings. *See* 28 U.S.C. § 157(b). In otherwise "related to" proceedings, the bankruptcy

## D. THE COMMITTEE'S EVIDENCE

In the Complaint, the Committee[11] alleged a variety of bases for recovery against the Pre–Petition Lenders who provided financing, secured by all of the Debtors' assets, that allowed the new owners to pay former owners of the businesses that were being combined in the April 2000 transaction what the Committee contends was far more than equity holders were entitled to receive. As described by the Committee, the transaction resulted in new investors acquiring the controlling interest of six operating entities for $27.5 million while the old shareholders of those same entities received approximately $58 million for their ownership interests.

Prior to the April 2000 transaction, Grand Eagle Co., Inc. owned four subsidiaries: (1) Grand Eagle Distribution, Inc.; (2) Eastern Electric, Inc.; (3) Ohio Transformer, Inc.; and (4) North American Coil Corp. (the "Pretransaction Subsidiaries"). According to Mr. King, prior to the April 2000 transaction, Grand Eagle Co., Inc., its Pretransaction Subsidiaries and ABB Services, Inc. (collectively, the "Transaction Entities") were obligated for approximately $41.6 million of indebtedness and the combined enterprise value of Transaction Entities was $47 million.

Pursuant to the April 2000 transaction, ABB Services, Inc. became a wholly owned subsidiary of Grand Eagle Co., Inc. ABB Services, Inc. combined with Eastern Electric, Inc., one of Grand Eagle Co., Inc.'s Pretransaction Subsidiaries, to form Grand Eagle Services, Inc. ("GES," and together with the Pretransaction Subsidiaries, the "Subsidiaries"). After the April 2000 transaction, Grand Eagle Co., Inc. and its Subsidiaries were obligated for $77.5 million of indebtedness.

According to the testimony of Mr. King and Mr. Speers detailed below, the level of financing provided by the Pre–Petition Lenders in connection with the April 2000 transaction was to be capped by a valuation of the Transaction Entities based upon projected earnings and, specifically a multiple of the estimated Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA"). The annualized EBITDA projections for the Transaction Entities generated by the banks and DCMI ranged between $21 million and $22 million. It appears that the Transaction Entities' historical earnings that formed the basis for the EBITDA estimates were materially overstated because, *inter alia*, of the failure to apply appropriate job accounting protocols to the recognition of income (testimony of Speers) with the result that management of the Transaction

court instead submits proposed findings of fact and conclusions of law to the district court unless the parties to the otherwise related proceeding consent to the bankruptcy court's jurisdiction to enter final orders and judgments. *See* 28 U.S.C. § 157(c)(1) and (2).

11. In this case, in the Application to retain counsel, filed after the parties presented the initial proposed cash collateral order to the Court, the law firm that the Trustee had chosen as his counsel disclosed that it represents or has represented some members of the prepetition lending group in matters unrelated to the Debtor (defined in the Application as Grand Eagle, Inc.). Under those circum-

stances, the trustee's counsel was not in a position to commence litigation against those Pre–Petition Lenders without their consent. Ohio Rules of Court, Code of Professional Responsibility DR 5–105(c) and EC 5–17. In addition, during the short period prior to February 28, 2002, the trustee and his counsel were consumed with the effort to sell the Debtors' three distinct lines of business which employed approximately 1,000 individuals in over 35 locations. These efforts also required the company employees to focus their energies and attention on addressing the numerous purchasers who emerged in the sale effort.

Entities had dramatically overstated earnings.

Less than three months after the April 2000 transaction, the Grand Eagle Co., Inc. and its Subsidiaries ended their fiscal year with EBITDA that was approximately $8 million less than the "conservative" $21 million estimate on which the refinancing was based. The April 2000 transaction added $35.9 million of new secured debt to the balance sheet of Grand Eagle Co., Inc. and its Subsidiaries ahead of the trade creditors. The purported refinancing left no asset of Grand Eagle Co., Inc. and its Subsidiaries free of the secured lenders' liens that secured total debt of $77.5 million but left them with only $300,000 for working capital from those loan proceeds. (In contrast, approximately $5 million of the loan proceeds were used to pay fees to the financial institutions providing the financing and various professionals involved in that project.) The Former Shareholders and Asea Brown Boveri, Inc., former parent of ABB Services, Inc., received approximately $58 million for their ownership interests. The only other source of working capital was a line of credit under which Grand Eagle Co., Inc. and its Subsidiaries could borrow up to $15 million based upon generating eligible inventory and accounts receivable. Based on these substantiated allegations, the Committee views the liens held by the Pre–Petition Lenders to be, *inter alia*, the product of fraudulent conveyances. For the purposes of assessing whether the bankruptcy estate has a colorable fraudulent conveyance claim, I find that the evidence is ample. *See, e.g., Lippi v. City Bank, et al. (In re Lippi)*, 955 F.2d 599 (9th Cir.1992) (finding that financing bank involved in leveraged buyout was initial transferee of corporate debtor's loan repayments and thus, such payments were avoidable pursuant to 11 U.S.C. §§ 544 and 550); *U.S. v. Tabor Court Realty Corp., et al.*, 803 F.2d 1288 (3d Cir.1986) (finding that mortgages executed to lender in connection with leveraged buyout were fraudulent conveyances).

Specifically, at the Remand Hearing, Mr. Speers testified that he became the Chief Financial Officer ("CFO") of Grand Eagle Co., Inc. in August 2000. As a part of his duties as CFO he became familiar with the challenged transactions that are the focus of the Complaint. In addition, as CFO, Mr. Speers became familiar with the corporate structure of the Transaction Entities before and after the April 2000 transaction. Mr. Speers also became familiar with the financial posture of the Transaction Entities both before and after the April 2000 transaction.

Mr. Speers testified that before and after April 2000 there were landlords, vehicle lessors, and property lessors, among others, who continued to have claims against Grand Eagle Co., Inc. and its Subsidiaries as of the date this bankruptcy filing, a significant fact because some of the Committee's claims rely upon Bankruptcy Code § 544.

Mr. King and Mr. Speers testified that the projected EBITDA of $21 million to $22 million used to value the leveraged buyout transaction was significantly different from the actual financial posture both before and after the April 2000 transaction closed. Mr. King testified that a more accurate estimation of the Transaction Entities' EBITDA for business valuation consideration at that time is $8 to 9 million. Mr. Speers testified that when he arrived in August 2000 he found the combined fiscal year 2000 EBITDA was in the range of $13 to 14 million.

Based on the testimony of Mr. Speers, the overstated earnings, at least in part, seem to be the result of certain accounting mispractices in which the Transaction Entities engaged. Mr. Speers stated that all

of the Transaction Entities had booked accounts receivable prematurely. Mr. Speers testified that this accounting practice had an impact on the projections used to value the April 2000 transaction by inflating accounts receivable and understating costs. More specifically, Mr. Speers testified that despite the fact that ABB Services, Inc. had recorded a purportedly one time $4.4 million loss to address these mispractices in January/February 2000, on April 7, 2000 ABB Services, Inc. had 2,000 jobs open and the costs for over half of those jobs had not been properly applied. These rampant irregularities plagued all of the Transaction Entities and apparently were not resolved prior to the April 2000 transaction.

Mr. Speers and Mr. King testified that before and after April 2000, Grand Eagle Co., Inc. and its Subsidiaries were not paying their debts as they came due. As noted above, Mr. King testified that the enterprise value of the Transaction Entities as of April 2000 was $47,000,000 and prior to the challenged transactions the debt was $41.6 million. As of the closing of the April 2000 transaction, Grand Eagle Co., Inc. and its Subsidiaries, including ABB Services, Inc., were indebted in the amount of $77.5 million. The Committee has produced significant evidence to support its claim that after the April 2000 transaction, the fair value of the assets was exceeded by the fair value of the debts, particularly as those debts had been increased to generate funds for the purchasing entity to pay the former owners.

Mr. King testified that in his opinion the Former Shareholders of Grand Eagle and its Pretransaction Subsidiaries, and Asea Brown Boveri, Inc. knew or should have known that the sale price was too high, the leveraging of the resulting operating assets too high and that the Transaction Entities' assets could not service the new

level of debt being created to allow the acquirer to pay the former equity holders. In addition, the Pre–Petition Lenders knew or should have known that the funds from their financing would be paid to the Former Shareholders and Asea Brown Boveri, Inc. and that upon the closing of the transaction Grand Eagle Co., Inc. and its Subsidiaries would be left insolvent. Mr. King and Mr. Speers testified that the structure of the April 2000 transaction left Grand Eagle Co., Inc. and its Subsidiaries with only with $300,000 in cash for operations. According to Mr. Speers, the April 2000 transaction left Grand Eagle Co., Inc. and its Subsidiaries without any otherwise unencumbered working capital. Similarly, Exhibit 6, which identifies the sources of the funds for the April 2000 transaction and the distribution of those funds, shows that Grand Eagle Co., Inc. and its Subsidiaries were left with only $300,000 cash from the April 2000 transaction.

Mr. Speers testified that he was concerned about the adequacy of the working capital, particularly in light of the fact that cash receipts were being rationed to pay vendors and that by August, 2000, that is, only four months after the close of the 2000 transactions, Grand Eagle Co., Inc. and its Subsidiaries had already drawn down 1/3 of the $15 million secured line of credit from the Pre–Petition Lenders. This rate of use of the working capital line was significantly greater than what had been projected in the April 2000 business plans and was the result of the inability to collect accounts receivable that were prematurely booked by Grand Eagle Co., Inc. and its Subsidiaries.

At the Remand Hearing, Mr. Fixler, a director at Candlewood Partners—the financial advisor to Glenn Pollack, Chapter 11 Trustee of the Detbors's estates testified that currently, the administrative expenses of the Grand Eagle estates total

between $600,000 to $800,000. In contrast, the estates have collected only $375,000, as the result of the settlement of certain preference litigation, for distribution to creditors. In addition, Mr. Fixler testified that the estates may collect an additional $600,000—$700,000 from the litigation and settlement of other preference actions. Absent any recovery from the Adversary Proceeding, the estates will not collect any additional funds for distribution to its creditors. Therefore, Mr. Fixler testified, absent a recovery from the Pre–Petition Lenders, there may not be sufficient funds to pay all administrative expense claimants and priority creditors and there will not be any funds available for distribution to unsecured creditors (who only receive a distribution after administrative expense claimants and priority creditors). Mr. Fixler testified that in the event the settlement of the Adversary Proceeding against the Pre–Petition Lenders was approved, there would be sufficient funds available to pay all of the administrative expense claimants and priority creditors, and to contribute to the ability of the Chapter 11 plan proponents to meet their burden of proof on the feasibility of the plan that has been voted upon by creditors of the bankruptcy estates and is awaiting a confirmation hearing.

## E. EVALUATION OF THE STANDING MOTION

### 1. Whether the Committee satisfied the standing requirements set forth by the Sixth Circuit Court of Appeals in *Canadian Pacific Forest Products Limited v. J.D. Irving, Limited (In re the Gibson Group, Inc.), 66 F.3d 1436 (6th Cir.1995)* [12]

 Based on the District Court's interpretation of the Sixth Circuit's decision in *In re the Gibson Group*, a creditor or a creditors' committee may have derivative standing to initiate an avoidance action where: (1) a demand has been made upon the statutorily authorized party to take action; (2) the demand is declined; (3) a colorable claim that would benefit the estate if successful exists, based upon a cost-benefit analysis performed by the court; and (4) the inaction is an abuse of discretion ("unjustified") in light of the debtor-in-possession's duties in a chapter 11 case. *In re The Gibson Group, Inc.*, 66 F.3d at 1438–39. In the Remand Decision, the District Court directed the Court to hold a hearing with respect to the third element of the standard set forth in Gibson. [13]

#### a. Colorable Claim

In *Gibson*, the Sixth Circuit does not elaborate upon when a claim is "colorable"

---

**12.** In accordance with the December, 2003 and January 21, 2004 stipulations of the parties, the Court reserves its judgment on whether the elements set forth in *Gibson* must be satisfied in order for a creditors' committee to have standing to pursue avoidance actions, in cases like this one, where the trustee/debtor-in-possession and the creditors' committee have agreed to a division of labor, such that the creditors' committee is to pursue the estate's avoidance actions. As the Sixth Circuit suggests in *Gibson*, section 1109 of the Bankruptcy Code may be a statutory basis for standing to file an avoidance action which is in addition to the judicially created derivative standing which applies in those instances where a trustee or debtor-in-possession abuses its discretion by failing to file an

avoidance action. *Gibson*, 66 F.3d 1436, fn. 1.

**13.** Pursuant to the *Gibson* decision, a creditor that seeks standing must demonstrate that the debtor in possession's refusal to bring suit "is unjustified in light of the statutory obligations and fiduciary duties of the debtor-in-possession in a Chapter 11 reorganization." *Gibson*, 66 F.3d at 1439. However, the Court in *Gibson* held that if a creditor demonstrates the existence of an unpursued colorable claim that would benefit the estate, it has met its burden to show that the debtor in possession's inaction was unjustified. *Gibson*, 66 F.3d at 1440.

for purposes of analyzing whether a creditor in a chapter 11 case has standing to bring a claim on the estate's behalf. However, in determining what constitutes a "colorable" claim, particularly in cases where the deadline for filing the avoidance action is short, many courts have taken a liberal approach.

On the issue of whether a claim is "colorable," the Court should consider whether the "Committee has asserted 'claims for relief that on appropriate proof would support a recovery.'" *In re Tennessee Valley Steel Corp.*, 183 B.R. 795, 800 (Bankr.E.D.Tenn.1995) (quoting *In re STN Enterprises, Inc.*, 779 F.2d 901, 905 (2d Cir.1985)). "Because the creditors' committee is not required to present its proof, the first inquiry is much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim." *In re America's Hobby Center, Inc.*, 223 B.R. 275, 282 (Bankr.S.D.N.Y.1998); *see also In re KDI Holdings, Inc.*, 277 B.R. 493 (Bankr.S.D.N.Y.1999); *In re Valley Park, Inc.*, 217 B.R. [864] at 869 n. 4 [(Bankr.D.Mont.1998)] (the committee "does not have to satisfy the quantum of proof necessary for a judgment in order to show a colorable claim"). While the Court need not "conduct a minitrial" of the claims, the Sprint Companies are correct in pointing out that the Court may weigh the "probability of success and financial recovery," as well as the anticipated costs of litigation, as part of a cost/benefit analysis conducted to determine whether pursuit of the colorable claims are likely to benefit the estate. *America's Hobby Center, Inc.*, 223 B.R. at 282.; *see also In re KDI Holdings*, 277 B.R. at 509 ("As to a claim's potential benefit to the reorganization estate, the Court must consider the probability of 'legal success and potential financial recovery' to the estate, 'whether it would be preferable to appoint a trustee,' and 'the terms relative to attorneys' fee on which suit might be brought.'"). Such an analysis is designed to ensure that the expected benefit to the estate will be reasonably sufficient to "'justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce.'" *Id.* (quoting *STN Enterprises, Inc.*, 779 F.2d at 906).

*In re iPCS, Inc.*, 297 B.R. 283 (Bankr. N.D.Ga.2003).

The District Court declined to take this approach and instead adopted the definition used in *In re Colfor, Inc.*, 1998 WL 70718, *2 (Bankr.N.D.Ohio 1998) that a colorable claim is one which is "plausible" or "not without some merit." This definition requires that the Court look beyond the complaint itself to at least some minimal evidentiary basis for the allegations, particularly, with respect to allegations of fraud. In *Colfor*, the bankruptcy case had been pending for over a year prior to the time the official committee of unsecured creditors requested leave to file an adversary proceeding against the debtor's former senior lenders. *In re Colfor*, 1998 WL 70718. In addition, the committee had already had an ample opportunity to engage in discovery regarding the actions of the former senior lenders and their successors in interest. *In re Colfor*, 1998 WL 70718, *1.

In contrast, in this case, the deadline for filing an avoidance action against the Pre-Petition Lenders was a mere 82 days after the petition date and only 55 days after the appointment of counsel for the Committee. In this instance, at the time of the filing of the Adversary Proceeding, there had not been an opportunity to conduct in depth discovery and it would be inappropriate to expect the Committee to be able to present its entire case to the Court at this

early stage. The Committee did however present to this Court "some minimal evidentiary basis for the allegations" in the Complaint.

Each of the Committee's causes of action against the Pre–Petition Lenders will be evaluated below.

### 1. Fraudulent Conveyance

The Committee's cause of action against the Pre–Petition Lenders in this instance is based on a constructive fraud theory pursuant to Ohio Revised Code § 1336.07 and 11 U.S.C. 544(b). [Am. Compl. ¶¶ 4,5,7,8,61,62 and 68–70]. Thus, as I noted in the Memorandum Opinion re: Motions to Dismiss:

> Rule 9(b) of the Federal Rules of Civil Procedure, which applies to bankruptcy proceedings pursuant to Bankruptcy Rule 7009, provides that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity." FED. R. BANKR. P. 7009; FED. R. CIV. P. 9(b). The purpose of the rule is to provide defendants with fair notice of the substance of a plaintiff's claim in order that a defendant may adequately prepare a responsive pleading. *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir.1988). It also serves to protect a defendant whose reputation may be harmed by meritless claims of fraud as well as to discourage "strike suits." [14] *Segal v. Gordon*, 467 F.2d 602, 607 (2nd Cir.1972).

> The Rule 9(b) pleading requirements are to be construed liberally given the provisions of Rule 8 which requires only a "short and plain statement of the claim." FED. R. BANKR. P. 7008(a); FED. R. CIV. P. 8(a); *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir.1988). Moreover, less stringent pleading requirements are imposed in bankruptcy proceedings when the plaintiff is a third party outsider to the allegedly fraudulent transaction which, initially, has only second hand information upon which to rely in framing issues. *Barr v. Charterhouse Group Int'l, Inc. (In re Everfresh Beverages, Inc.)*, 238 B.R. 558, 581 (Bankr.S.D.N.Y.1999); *Profilet v. Cambridge Fin. Corp.*, 231 B.R. 373, 379 (S.D.Fla.1999); *Bell v. Collins (In re Collins)*, 137 B.R. 754, 755–56 (Bankr.E.D.Ark.1992); *Birnberg v. Rancho La Costa, Inc. (In re Reach McClinton & Co., Inc.)*, 62 B.R. 978, 982–83 (Bankr.D.N.J.1986).[15]

The Committee is alleging that the transfer of proceeds from Grand Eagle to ABB through the April 2000 transaction can be avoided pursuant to § 544(b) of the Bankruptcy Code and applicable

---

**14.** A "strike suit" is a "[s]hareholder derivative action begun with hope of winning large attorney fees or private settlements, and with no intention of benefitting the corporation on behalf of which suit is theoretically brought." BLACK'S LAW DICTIONARY 1423 (6th ed.1990). After considering the evidence presented at the Remand Hearing the Court does not believe that the Adversary Proceeding is a "Strike Suit."

**15.** Concerns regarding the specificity requirement of Rule 9(b) as applied to a third party outsider have been addressed by Professors Wright and Miller:

> The sufficiency of a particular pleading under Rule 9(b) depends upon a number of variables.... When the pleader is asserting that third persons have been defrauded, he may be unable to detail the claim and less particularity should be required. Thus, simple allegations should suffice for claims of fraud in an informer's action or a derivative suit and primary reliance should be placed on the discovery process for uncovering factual details.

5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1298 (2d ed.2002).

state law. The applicable state law that the Committee is relying upon provides that a transfer is constructively fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and if the debtor:

> (1) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

> (2) intended to incur, or believed or reasonably should have believed that it would incur, debtor beyond its ability to pay as they became due.

OHIO REV. CODE ANN. § 1336.04 (Anderson 1993); 740 ILL. COMP. STAT. ANN. 160/8 (West 2002).[16]

Although in some instances only general, the Committee does set forth allegations in the Amended Complaint meeting all the elements of a constructive fraud claim under the applicable Ohio and Illinois statutes. [Am. Compl. ¶¶ 4, 5, 7, 8, 61, 62 and 68–70]. The Amended Complaint also includes some more specific allegations such as that the Former Shareholders controlled Grand Eagle and the Pre–Transaction Subsidiaries immediately before the April 2000 transaction and that shortly after the transaction closed the actual financial posture of Grand Eagle and the Subsidiaries was much different than the projected financials which defendants used to value the challenged transaction. [Am. Compl. ¶¶ 63, 65, 66].

*In re Grand Eagle Cos., Inc.,* 288 B.R. 484, 495–96 (Bankr.N.D.Ohio 2003).

The testimony of Mr. Speers established that there are creditors of the Debtors whose claims arose before and after the April 2000 transaction, the contested transfer by the Debtors. The testimony of Mr. King and Mr. Speers regarding the terms of the transaction make it plausible that the Debtors did not receive reasonably equivalent value in exchange for the transfer related to the April 2000 transaction. In addition, their testimony supported the Committee's allegation that the Debtors were insolvent at the time of the transfer, became insolvent as the result of the transfer and/or were left with inadequate working capital. Thus, looking beyond the Complaint itself, and considering the evidence presented at the Remand Hearing, the Court finds that the Committee has a colorable claim for fraudulent conveyance against the Pre–Petition Lenders.

### 2. Preferences

In the Complaint, the Committee alleges that the June 2001 transactions and other payments made by Grand Eagle to the Pre–Petition Lenders during 90 days and one year prior to the bankruptcy petition date constitute preferences pursuant to section 547 of the Bankruptcy Code. According to the Complaint the Debtor's Statement of Financial Affairs shows payments in excess of $600,000 to the agent for the Pre–Petition Lenders during the 90 days prior to the Petition Date. If the Committee is successful in avoiding the Pre–Petition Lenders' security interest in the Debtors' assets, or if the Pre–Petition Lenders are determined to have been un-

---

**16.** Both of these statutory provisions also address avoidance actions on the basis of actual fraud which the Committee is not alleging in the Amended Complaint. Some courts have held that a claim for a constructively fraudulent conveyance has nothing to do with fraud

so that Rule 9(b)'s pleading requirements are not applicable to such claims. *See, e.g., Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.),* 281 B.R. 506, 518 (Bankr.E.D.N.Y.2002).

dersecured at the time of the payments, the payments made to them during the preference periods will be avoidable under Section 547(b).

In the Complaint the Committee alleges each element of a statutory claim pursuant to § 547(b) of the Bankruptcy Code. [Am. Compl. ¶¶ 99–103 and ¶¶ 104–109]. The elements are:

a. any transfer of an interest of the debtor in property

b. to or for the benefit of a creditor

c. for or on account of an antecedent debt owed by the debtor before the "transfer was made"

d. made while the debtor was insolvent

e. made within 90 days before bankruptcy or between 90 days and one year before bankruptcy if the transferee was an insider

f. that enables the creditor to receive more than it would receive if (1) the case were a chapter 7, (2) the transfer had not been made and (3) the creditor received payment of its debt to the extent provided by the bankruptcy code.

*See* Collier on Bankruptcy, ¶ 547.01 *citing* 11 U.S.C. § 547(b).

Based on the testimony of Mr. King and Mr. Speers that the Debtors were not paying their debts as they came due, the Court finds it plausible that the Debtors were insolvent when the allegedly preferential transfers were made. Furthermore, as a matter of law, for the purpose of section 547 of the Bankruptcy Code, a debtor is presumed to be insolvent for the 90 days prior to bankruptcy. 11 U.S.C. § 547(f). In addition, in light of the finding that the Committee can challenge the Pre–Petition Lenders' security interests as fraudulent transfers, payments made to the Pre–Petition Lenders within relevant preference periods prior to the Petition Date may be avoidable if the Pre–Petition Lenders were not fully secured lenders. Accordingly, the Committee is entitled to proceed on its preference claims against the Pre–Petition Lenders.

### 3. Equitable Subordination

For all of the reasons noted above, the Committee has standing to pursue equitable subordination without having to seek court approval to do so. Further, even if the Committee does have to satisfy the *Gibson* criteria, the Committee has more than done so. To succeed on a claim of equitable subordination, the Committee must demonstrate that (1) the claimant engaged in some type of inequitable conduct; (2) the misconduct resulted in injury to creditors or conferred an unfair advantage to the claimant; and (3) equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code. *Bayer Corp. v. MasoTech, Inc. (In re AutoStyle Plastics)*, 269 F.3d 726, 744 (6th Cir.2001); *see also, In re Colfor, Inc.*, 1998 WL 70718, *3 (Bankr.N.D.Ohio 1998). Satisfaction of this three-part standard does not mean that this Court is required to equitably subordinate a claim, but only that such action may be taken as "equitable subordination is an unusual remedy which should be applied in limited circumstances." *In re AutoStyle Plastics*, 269 F.3d at 744–45 (citation omitted).

The Committee alleges that the Pre–Petition Lenders' claims should be equitably subordinated because they engaged in misconduct by "causing, participating in, and aiding and abetting the fraudulent transfers and illegal dividends, distributions, and redemptions to ABB and the Former Shareholders alleged herein, and for receiving the benefit of those fraudulent transfers ...." [Amend. Compl. ¶ 124]. The evidence presented during the Remand Hearing suggests that the Pre-petition Lenders were aware of the structure of the transaction and who would benefit from it.

### b. Cost–Benefit Analysis

In addition to determining whether the claims are "colorable," the Court must perform a cost-benefit analysis to determine whether the claim, if successful, would benefit the estate. Remand Decision, p. 10, 12. Based on Mr. Fixler's testimony, the Court concludes that the claim against the Pre–Petition Lenders, if successful, would benefit the estate. The argument has been raised that the deficiency claim held by the Pre–Petition Lenders is so large that nearly all of any recovery would be paid to the Pre–Petition Lenders. This argument fails in light of the request of the Committee in the Amended Complaint that the claims (including the deficiency claim) held by the Pre–Petition Lenders be equitably subordinated to the claims of unsecured creditors. If successful, the Pre–Petition Lenders' deficiency claim would be subordinated to the claims of the unsecured' creditors and any recovery would be paid to the unsecured creditors before being paid to the Pre–Petition Lenders.

In addition, Committee's counsel is only looking to the estate for reimbursement of its costs; counsel agreed to be paid its fees on a contingency basis, rather than look to the estate for hourly compensation for work related to the avoidance action. Given that the fees are not to be borne by the estate, the cost of pursuing this litigation is likely to be, although not small, relatively insignificant in comparison to the potential recovery for the Debtors' estate.

**2. Whether the failure of the Committee to obtain an order granting it standing to pursue such an action prior to February 28, 2002 was fatal to its ability to pursue the avoidance action against the Pre–Petition Lenders.**

Initially, I note that the February 28, 2002 deadline was met when the Committee filed its Complaint asserting equitable subordination, a cause of action for which the Committee has direct standing. Further, at the outset of the Remand Hearing counsel for the Committee and the Pre–Petition Lenders indicated to this Court that the matter of whether the Committee had complied with the February 28, 2002 filing deadline was a question of law which had been briefed by each party in prior pleadings filed with this Court. As to that purely legal issue, this Court read into the record the following operative paragraph from the Cash Collateral Order:

12. Unless a party in interest, including but not limited to, the Chapter 11 Trustee or chapter 7 trustee appointed in these Cases or the Committee, commences as appropriate, a contested matter or adversary proceeding raising any objection or challenge to the validity and perfection of the Pre–Petition Liens of the Pre–Petition Lenders by no later than February 28, 2002, all such challenges and objections shall be forever waived, and the Pre–Petition Obligations shall be allowed as a secured claim within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with the Cases. Thereafter, any and all objections or challenges (including, but not limited to, those under sections 506, 544, 547 and/or 548 of the Bankruptcy Code), by any party (including, without limitation, any Chapter 11 or Chapter 7 trustee appointed herein) to the validity, sufficiency, extent, perfection, priority or refinancing of, or seeking the avoidance of, the Pre–Petition Liens, the Pre–Petition Obligations and any payments thereon, shall be forever barred.

[Docket # 46 at 13–14]. This Court then noted that, although originally drafted by counsel for the Chapter 11 Trustee and the Pre–Petition Lenders,[17] the Cash Collateral Order became a binding Order of this Court once it was signed and entered. Therefore, this Court has the inherent authority to interpret and, if necessary, clarify such order. *In re Williams*, 256 B.R. 885, 893 (8th Cir. BAP 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 947 (Bankr.N.D.Ohio 1987).

▉ Because the only affirmative requirement in paragraph 12 of the Cash Collateral Order is that an adversary proceeding raising an objection or challenge to the validity and perfection of the Pre–Petition Lenders' liens be *commenced* by not later than February 28, 2002, this Court noted that the Committee appears to have complied with that requirement by filing the Committee Adversary Proceeding on February 28, 2002. Moreover, because the Cash Collateral Order is silent as to when the issue of the Committee's standing must be resolved, the statute of limitations sought to be imposed by the Pre–Petition Lenders upon an as yet unformed and unrepresented party in interest in this case did not pass simply because the issue of the Committee's standing was not also ruled upon by the February 28th deadline. This is emphatically so in this case because the Trustee's chosen counsel who were involved in the negotiation of this deadline were aware that they had existing client relationships that obscured

their ability to commence litigation on behalf of the Trustee. *See* Appendix A, at 41. Because determination of the Committee's standing is one that must be made by this Court only after an actual court hearing and ruling and because time on this Court's docket has been growing more scarce due to the volume of bankruptcy filings in this Court location,[18] it would not be appropriate to read into paragraph 12 of the Cash Collateral Order an affirmative obligation on this Court to act on a tangential matter (that is, determining the Committee's standing) . by a party-imposed deadline. Had that been the expressed intent of the parties who drafted the Cash Collateral Order, particularly given the time frame in this case, it would not have been signed and entered by this Court.

▉ In similar circumstances, where the timeline within which the committee must file an action is short, courts have determined that *nunc pro tunc* relief authorizing a committee to file an avoidance action on behalf of the estate is appropriate. *See, e.g., In re America's Hobby Center, Inc.*, 223 B.R. 275 (Bankr.S.D.N.Y. 1998); *In re Catwil Corp.*, 175 B.R. 362 (Bankr.E.D.Cal.1994); *Liberty Mutual Ins. Co. v. Official Unsecured Creditors' Committee of Spaulding Composites Co. (In re Spaulding Composites Co.)*, 207 B.R. 899 (9th Cir. BAP 1997).

The general rule is that adversary proceedings instituted by the creditors' committee on the estate's behalf require

**17.** At the time that the December 20, 2001 cash collateral order was entered, the Committee (which had only been formed on December 17, 2001) had not yet retained counsel and was not actively participating in this chapter 11 case. The Committee filed its application to retain counsel on January 9, 2002 and that application was approved by an Order of this Court entered on February 5, 2002. *See also* footnote n.4, *infra.*

**18.** The total number of new cases filed on this Court's docket for the calendar years since the Debtors filed their chapter 11 cases are as follows: year 2001—5158; year 2002—6058; and year 2003—6912. These numbers do not include hundreds of adversary proceedings also added to my docket each year.

prior court approval; in appropriate instances, however, a court may grant retroactive approval. *See In re Catwil Corp.*, 175 B.R. at 364; *In re Chemical Separations Corp.*, 32 B.R. at 819; *Liberty Mutual Ins. Co. v. Official Unsecured Creditors' Committee of Spaulding Composites Co. (In re Spaulding Composites Co. Inc.)*, 207 B.R. 899, 905 (9th Cir. BAP 1996). While courts find that "the better practice is for the plaintiff to secure approval before filing the complaint, [they] will not foreclose the ability of a court to make its approval of the representation retroactive to the time of the filing." *In re Spaulding Composites Co. Inc.*, 207 B.R. at 905. "To hold otherwise would generate needless dismissals and refilings." *Id.* (citing *In re Catwil Corp.*, 175 B.R. at 365); *In re Louisiana World Exposition, Inc.*, 832 F.2d 1391, 1398 (5th Cir. 1987). Moreover, "the overall 'fairness' concept of bankruptcy laws mandates that the debtor's transactions should not pass without examination." *Official Unsecured Creditors' Committee v. Rachles (In re [S.] Rachles, Inc.)*, 131 B.R. 782 (Bankr.D.N.J.1991) (quoting *In re Jones*, 37 B.R. 969, 974 (Bankr. N.D.Tex.1984)).

*In re America's Hobby Center, Inc.*, 223 B.R. at 281. Retroactive approval has been granted, when "time was of the essence" because of a statute of limitations and where there was little "likelihood of confusion" as to who would file the adversary proceeding. *In re Catwil Corp.*, 175 B.R. at 365.

In *America's Hobby*, the bankruptcy court noted that:

Even assuming that our debtor had not waived its right to bring an avoidance action against the bank, it is unlikely that it would have done so, for some of the Committee's claims involve the debt-or's guarantee of its non-debtor affiliate's debt to the bank, as to which debt the debtor's insiders are alternative guarantors. Thus, to the extent that the debtor's exposure were eliminated, the insiders' exposure would be augmented. If the Committee cannot bring an action to avoid the guarantee and the resulting security interest, the inherent conflict of the debtor's insiders makes it unlikely that the debtor will plug the gap. In any event, whatever the motivations of those in control of the debtor, the debtor gave up the ability to sue the bank. Therefore, "overall fairness" would require the grant of retroactive approval. *In re Rachles, Inc.*, 131 B.R. at 786. Similar to *Catwil*, there can be no confusion as to who would bring the adversary proceeding, the debtor having contracted away its right to sue and more importantly, the bank having agreed that the Committee had a period of time in which to challenge its liens. *See In re Catwil Corp.*, 175 B.R. at 365. Although procedurally flawed, the filing of the Committee's adversary proceeding was a good faith attempt to object to bank's liens or security interest fully within the spirit of the cash collateral agreement and order. *See In re Rachles, Inc.*, 131 B.R. at 786. Certainly "time was of the essence" as the Committee would have jeopardized its right to receive reimbursement from the estate (in the face of the grant by the debtor of a lien on proceeds of the bank's collateral) had the Committee not filed its adversary proceeding. *In re Catwil Corp.*, 175 B.R. at 365. While some might argue that the evaporation of a source of payment is not a relevant consideration, if the Committee's professionals could not receive payment over the bank's objection out of the bank's collateral, which here constitutes the bulk of the estate's available assets, potentially beneficial ac-

tions might not be undertaken, to the estate's and unsecured creditors' detriment. *See Glinka v. Abraham And Rose Company Ltd.,* 199 B.R. 484, 494 (D.Vt.1996).

Under all these circumstances, retroactive approval should be granted if the Committee's action is warranted under the *STN Enterprises* rubric. So it is to those requirements that we turn.

*In re America's Hobby Center, Inc.,* 223 B.R. at 282.

Similarly, I find that retroactive approval, to the extent necessary, is appropriate in this case. Although the Trustee could have brought suit against the Pre–Petition Lenders, it is unlikely that he would have done so given his counsel's acknowledged representation of one or more of the Pre–Petition Lenders. Thus, as in *America's Hobby,* if the Committee cannot bring the avoidance action against the Pre–Petition Lenders, the transaction of the Debtors and the Pre–Petition Lenders likely will go unscrutinized. In addition, no party to the Adversary Proceeding can claim any confusion as to who would bring the Adversary Proceeding given the agreement of the Trustee and Committee memorialized in the March 27, 2002 Stipulation. Finally, time was of the essence. As a result of the fast pace of the Debtors' chapter 11 cases in the initial months after filing, the February 28, 2002 deadline for filing an avoidance action against the Pre–Petition Lenders was short. Had the Committee not filed its Complaint on or before that date it would have lost the ability to pursue such a challenge. For all of these reasons, I find that the Committee should be granted standing, *nunc pro tunc,* to pursue the avoidance action against the Pre–Petition Lenders.

## F. CONCLUSION

The length and detail of the foregoing findings of fact and conclusions of law was necessary to discharge the assignments given to me in the Remand Decision. In the future, one needs to consider what judicial resources should be spent on a preliminary issue that determines none of the substantive issues in the case.

Based upon the foregoing findings of fact and conclusions of law, it is the recommendation of this Court that the District Court find the Committee has direct standing to assert equitable subordination pursuant to Bankruptcy Code section 510(c) against the Pre–Petition Lenders, derivative standing to bring bankruptcy avoidance actions against the Pre–Petition Lenders and that obtaining such approval after February 28, 2002 is of no consequence to the Committee's case.

**IT IS SO ORDERED.**

### APPENDIX A

**1. The Bankruptcy Case**

On December 7, 2001, Grand Eagle Companies, Inc. and five of its wholly owned subsidiaries [19] (collectively, "Debtors") filed voluntary chapter 11 bankruptcy petitions. *See* December 1, 2003 Stipulation of Facts in Connection with the Hearing on the Motion to Approve Stipulated Agreed Order Authorizing the Official Committee of Unsecured Creditors to Investigate and Prosecute Certain Claims and Causes of Action on Behalf of Bankruptcy Estate, as Amended, ¶ 1 [main docket # 882] (the "December 1 Stipulation"). The chapter 11 cases of the subsidiaries are being jointly administered with the chapter 11 case of Grand Eagle Companies, Inc. *See* December 1 Stipulation,

---

**19.** Those subsidiaries are: Grand Eagle Services, Inc. (f.k.a. ABB Services, Inc.); Grand Eagle Distribution, Inc.; Grand Eagle Services North America, Inc.; Ohio Transformer, Inc.; and North American Coil Corporation. The Debtor and its Subsidiaries were providers of motor, breaker and transformer services.

¶ 2. On December 10, 2001, management of Debtors moved for the appointment of a chapter 11 trustee [main docket # 20], because, among other things, the working relationship between the Debtors' management and the Pre–Petition Lenders had completely deteriorated. After a short hearing on the uncontested matter, the Court granted that motion on the same day it was filed. [main docket # 25]. *See* December 1 Stipulation, ¶ 5. On December 13, 2001, Glenn Pollack was appointed as Chapter 11 Trustee. *See* December 1 Stipulation, ¶ 6. After his appointment, the Chapter 11 Trustee focused on the sale of the Debtors' businesses as going concerns in order to maximize value for the estate and preserve jobs for the community.

On December 20, 2001, the Court entered the Cash Collateral Order [main docket # 46] (the "Cash Collateral Order"). *See* December 1 Stipulation, ¶¶ 8 and 10.

On December 21, 2001, the Trustee filed an application to employ Benesch, Friedlander, Coplan and Aronoff, LLP ("BFCA") effective as of December 13, 2001 [main docket # 51]. In the application and related verified statement [main docket # 52], BFCA disclosed that it represents or has represented one or more of the members of the prepetition lending group in matters unrelated to the Debtor (the disclosure was silent as to matters related to the Subsidiaries). No objections to the Trustee's application to employ BFCA were filed with the Court and there was no response from the United States Trustee. On January 10, 2002, the Court granted the Trustee's uncontested application to employ BFCA effective December 13, 2001 [main docket # 75].

The Committee filed an application to employ counsel on January 10, 2003 [main docket # 71]. *See* December 1 Stipulation, ¶ 11. ? The Court entered an Order authorizing such employment on February 4, 2002 [main docket # 129]. *See* December 1 Stipulation, ¶ 17.

On January 30, 2002, the Chapter 11 Trustee, with the support of the Pre–Petition Lenders,[20] filed motions seeking authority to sell substantially all of Debtors' assets [main docket # 114 and main docket

20. In his motion seeking approval of certain bid procedures [main docket # 115 at 4–5] the Chapter 11 Trustee set forth the following:

Immediately upon his appointment, the Trustee identified the need to intensify the going concern sales efforts in order to preserve and maximize value for all parties in interest. The Trustee entered into an engagement letter with [Brown, Gibbons, Lang & Company Securities, Inc.] and intends to seek BGL's retention as sales agent in these cases. Together with BGL, the Trustee articulated a comprehensive and aggressive sales campaign that capitalized on BGL's pre-petition efforts and the "catalytic" effect of these Chapter 11 cases on potential strategic purchasers' acquisition interest. To that end, the Trustee agreed with [the Pre–Petition Lenders] . . . to select by January 23, 2002, one or more competitive "stalking horse" bids to purchase each

of the Debtors' three business segments. (*See*, the Stipulated Order Authorizing Use of Cash Collateral entered January 10, 2002). In the event that there were no bids for any of the Debtors' business segments satisfactory to the Trustee or the [Pre–Petition Lenders], pursuant to such Stipulated Order the Trustee agreed that, by January 28, 2002, he would file the Sale Motion and this Motion seeking approval of the Competitive Bidding Procedures with respect to the auction sale of the assets of any such business segment(s). . . .

The confirmation by the newly appointed Chapter 11 Trustee of an immediate need to market Debtors' assets as a going concern coupled with the very short deadline in the Cash Collateral Order for the Chapter 11 Trustee or any other party in interest to bring an action challenging the Pre–Petition Lenders' liens and other obligations essentially necessitated an implicit division of

# 116]. An auction of those assets was held and the sales were approved after a February 26, 2002 hearing on the matter [main docket # 195 and main docket # 196]. This chronology underscores the intense level of activity in the period prior to February 28, 2002 by the newcomers to this business, the Chapter 11 Trustee and the Committee.

## 2. Committee Standing Motion

On February 22, 2002, the Committee, through its counsel, filed a pleading captioned "Motion to Approve Stipulated Agreed Order Authorizing the Official Committee of Unsecured Creditors to Investigate and Prosecute Certain Claims and Causes of Action on Behalf of the Bankruptcy Estate" [main docket # 183] (the "Initial Standing Motion"). *See* December 1 Stipulation, ¶ 18. On February 25, 2002, the Pre–Petition Lenders filed an objection to the Initial Standing Motion [main docket # 187]. *See* December 1 Stipulation, ¶ 20. The Initial Standing Motion was set for a hearing on February 26, 2002. *See* December 1 Stipulation, ¶ 21. During the February 26, 2002 hearing on, *inter alia,* the Initial Standing Motion, counsel for the Committee orally withdrew the motion to expedite and indicated that the Committee would amend the

Initial Standing Motion to reflect that such pleading was not being filed jointly with the Chapter 11 Trustee. *See* December 1 Stipulation, ¶ 22. At that hearing, the Committee advised the Court that it would file a complaint alleging avoidance claims by February 28, 2002. *See* December 1 Stipulation, ¶ 23.

Also during the February 26, 2002 hearing, the Chapter 11 Trustee made the following representations to the Court: (1) that the Chapter 11 Trustee, through counsel, decided not to file any avoidance and/or preference actions against Credit Agricole Indosuez ("CAI") itself and as agent for the pre-petition lenders (the "Pre–Petition Lenders"); [21] and (2) that the Committee then asked the Chapter 11 Trustee, through his counsel, if the trustee would share standing with the Committee and the Trustee agreed.[22]

On February 28, 2002, the Committee filed a complaint (the "Complaint") thus initiating adversary proceeding # 02–5090 (the "Adversary Proceeding").[23] *See* December 1 Stipulation, ¶ 24. In the Complaint, as amended, the Committee named the following defendants: (1) ASEA Brown Boveri, Inc.; (2) the Pre–Petition Lenders and (3) the "Former Shareholders" [24] alleging the following causes of ac-

labor between the Chapter 11 Trustee and the Committee.

**21.** The conflict noted on page 41 and in note 11 above underscores the need, in this case, for a division of labor between the Committee and the Trustee, particularly with respect to the pursuit of avoidance claims actions against the Pre-petition Lenders. Not surprisingly, the Trustee and the Committee agreed that the Committee would pursue the avoidance action against the Pre–Petition Lenders.

**22.** On March 27, 2002, a Stipulation by and between the Trustee and the Committee regarding the Standing Motion was filed. *See*

December 1 Stipulation, ¶ 27. The March 27, 2002 Stipulation provides in paragraph 14 that "the Trustee has no objection to the Committee's prosecution of the adversary proceeding commenced on February 28, 2002, on behalf of the Bankruptcy Estates." *See* December 1 Stipulation, ¶ 27.

**23.** On July 11, 2002 the Committee filed a "First Amended Complaint" in the Adversary Proceeding [AP docket # 23] against the same defendants.

**24.** The "Former Shareholders" are comprised of the following: Keystone Venture IV, L.P.; Inroads Capital Partners; The Blue Chip Op-

tion against the Pre–Petition Lenders: (a) Count 3—fraudulent transfers to the Pre–Petition Lenders; [25] (b) Count 8—payment of non-insider preferences to the Pre–Petition Lenders; [26] (c) Count 9—payment of insider preferences to the Pre–Petition Lenders; [27] (d) Count 11—declaratory judgment to determine the validity and extent of liens purportedly held by the Pre–Petition Lenders; [28] (e) Count 12—equitable subordination of claims held by the Pre–Petition Lenders; [29] and (f) the disallowance of claims to any/all defendants.[30]

On March 13, 2002, the Committee filed an "Amended Motion for Entry of Order Authorizing the Official Committee of Unsecured Creditors to Investigate and Prosecute Certain Claims and Causes of Action on Behalf of the Bankruptcy Estate" [main docket # 230] (the "Amended Standing Motion") (collectively with the Initial Standing Motion, the "Standing Motion"). *See* December 1 Stipulation, ¶ 25. Also on March 13, 2002, the Committee filed a brief in reply to the Pre–Petition Lenders' objection to the Initial Standing Motion [main docket # 232]. *See* December 1 Stipulation, ¶ 26. On April 3, 2002, the Pre–Petition Lenders filed a Reply Memorandum to the Standing Motion [main docket # 297]. *See* December 1 Stipulation, ¶ 28.

This Court heard oral argument on the Standing Motion, a contested matter in the main case because of the objection of the Pre–Petition Lenders (who have standing in the main case). I failed to limit argument with respect to that motion only to parties with standing in the main case, permitting the Former Shareholders, who in fact had no standing in the main case, to participate. The Standing Motion was taken under advisement at the conclusion of that hearing. *See* December 1 Stipulation, ¶ 32. On June 24, 2002, the Court entered an oral opinion granting the Standing Motion (the "Standing Decision") and authorizing the Committee, *nunc pro tunc*, to investigate and prosecute the Adversary Proceeding. On June 27, 2002, the Court entered an entry of judgment regarding the Standing Decision [main docket # 413 and Transcript of the Oral Decision at main docket # 510]. That decision failed to note that the Former Shareholders were not appropriate parties in the *Gibson* hearing.

Thereafter, the Pre–Petition Lenders filed an appeal of the Standing Decision [main docket # 418]. *See* December 1 Stipulation, ¶ 33. The Former Shareholders also appealed this Court's Standing Decision [main docket # 436]. *See* December 1 Stipulation, ¶ 33. Both appeals were assigned to the docket of Judge Polster of the Northern District of Ohio and were consolidated. No stay of the Adversary

---

portunity Fund Limited Partnership; The Blue Chip Capital Fund, L.P.; Grand Eagle Associates, L.P.; Grand Eagle Associates II, L.P.; Jerry O. Williams; William R. Givens and Richard B. Black.

**25.** Pursuant to section 544(b) of title 11 of the United States Code (the "Bankruptcy Code"), Ohio Revised Code § 1336.07 and 740 Ill. Comp. Stat. 160/8.

**26.** Pursuant to § 547(b) of the Bankruptcy Code.

**27.** *Id.*

**28.** Pursuant to New York law.

**29.** Pursuant to § 510(c) of the Bankruptcy Code.

**30.** Pursuant to § 502(d) of the Bankruptcy Code.

Proceeding was sought pending that appeal.

Before Judge Polster ruled on the consolidated appeals, on July 24, 2002 defendant, ASEA Brown Boveri, Inc., filed a motion seeking to dismiss the Committee's Amended Complaint [AP docket # 30]. On August 19, 2002, one of the Pre–Petition Lenders, The Prudential Insurance Company of America ("Prudential"), also filed a motion seeking dismissal of the Committee's Amended Complaint [AP docket # 35]. On January 14, 2003, this Court entered a "Memorandum Opinion Re: Motions to Dismiss" [AP docket # 47]. Through that Memorandum Opinion and an Entry of Judgment [AP docket # 48] this Court denied ASEA Brown Boveri, Inc.'s motion to dismiss in its entirety and granted Prudential's motion to dismiss it as a defendant on two of six counts.

After the Bankruptcy Court ruled on the Motions to Dismiss, ASEA Brown Boveri, Inc. filed an answer in the Adversary Proceeding and endorsed it with a demand for a jury [AP docket # 54]. The Former Shareholders also filed an answer in the Adversary Proceeding requesting a trial by jury [docket # 57]. After filing answers endorsed with jury demands, both ASEA Brown Boveri, Inc. and the Former Shareholders filed motions seeking that the U.S. District Court withdraw its reference of the Adversary Proceeding to the Bankruptcy Court because, *inter alia,* neither movant consented to a jury trial being conducted by this Court [AP docket # 52 and AP docket # 58]. The motions to withdraw the reference were assigned to Judge Gwin. Given its determination that both ASEA Brown Boveri, Inc. and the Former Shareholders were entitled to a jury trial on several claims against them

and because neither consented to the Bankruptcy Court conducting such a trial, Judge Gwin entered an Order withdrawing the reference of the entire Adversary Proceeding on March 26, 2003 [AP docket # 61].[31] The Adversary Proceeding was then transferred to Judge Gwin's docket and currently pends there as Case # 5:03–CV–00551.

After the District Court withdrew the reference of the Adversary Proceeding, the Committee and the Pre–Petition Lenders reached a settlement agreement with respect to the claims against the Pre–Petition Lenders. On September 26, 2003, the Committee filed a motion to approve the settlement pursuant to Bankruptcy Rule 9019 in the Bankruptcy Court. After a hearing on that motion in the main case on October 21, 2003, this Court entered proposed findings of fact and conclusions of law regarding the Committee's motion to approve the settlement and submitted them to Judge Gwin for consideration in the withdrawn Adversary Proceeding. These findings and conclusions address why the Court did not think it appropriate to enter a final order on that motion, that being the normal disposition of Rule 9019 motions.

On September 26, 2003, the Trustee filed a Disclosure Statement and a Joint Consolidated Liquidating Plan of the Committee and the Trustee. The Court scheduled a hearing on the approval of the Disclosure Statement for October 28, 2003. On October 28, 2003, the Disclosure Statement, as amended, was approved and the Court scheduled a confirmation hearing for November 24, 2003 [main docket # 827].

Before Judge Gwin considered the proposed findings of fact and conclusions of law with respect to the motion to approve

---

**31.** The District Court also withdrew the reference as to the claims pending against the Pre– Petition Lenders to prevent the wasting of judicial resources and the parties' resources.

the settlement, on November 20, 2003, District Court Judge Dan Polster entered a "Memorandum of Opinion and Order" in the consolidated appeals, case numbers 5:02 CV 1668 and 5:02 CV 1812, (the "Remand Decision") regarding the appeal of the Standing Decision. *See* December 1 Stipulation, ¶ 37. In the Remand Decision, Judge Polster directed this Court to conduct a further hearing on the Standing Motions (the "Remand Hearing") and to issue a written report and recommendation to Judge Gwin, by not later than January 30, 2004.[32]

The November 24, 2003 hearing was adjourned to a conference call on November 25, 2003. At that point Judge Gwin had ruled that the standing issue must be addressed before the district court would rule on settlement between the Committee and the Pre–Petition Lenders. Because the approval of the settlement with the Pre–Petition Lenders is necessary in order for the Joint Plan to be feasible and thus, confirmable, the Court has adjourned the confirmation hearing indefinitely.

---

**32.** Given that the Remand Hearing commenced on December 1, 2003 was not completed until January 12, 2004 as explained above, and that the parties did not submit additional stipulations to the Bankruptcy Court until January 21, 2004, the deadline of January 30, 2004 was too short for this Court to give adequate consideration to the matter. Thus, this written report and recommendation to Judge Gwin is not dated as of January 30, 2004, but as of February 6, 2004.